UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| SCOTT SESSUMS,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br>ACTING COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>Defendant.[1] | Case No. 1:15-CV-205-RLW |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying the application of Scott Sessums ("Sessums") for disability insurance benefits.

### I. Background

Sessums filed an application for Supplemental Security Income on May 24, 2012. The Social Security Administration ("SSA") denied Sessums' application for benefits, and he filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). The SSA granted Stewart's request and a hearing was held on May 1, 2014. The ALJ issued a written decision on August 12, 2014, upholding the denial of benefits. (Tr. 9-26). Sessums filed a timely Request for Review of Hearing Decision with the Appeals Council. The Appeals Council denied Sessums' Request for Review on September 25, 2015. (Tr. 1-4). The decision of the ALJ thus stands as

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Sessums filed this appeal on November 9, 2015. (ECF No. 1). Sessums filed a Brief in Support of his Complaint on February 8, 2016. (ECF No. 10). The Commissioner filed a Brief in Support of the Answer on May 6, 2016. (ECF No. 16).

## II. Decision of the ALJ

The ALJ found that Sessums had the following severe impairments: degenerative disc disease of the lumber spine with residuals of surgical open reduction and internal fixation and anxiety disorder. (Tr. 14). The ALJ, however, determined that Stewart did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 16). The ALJ found that Sessums had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 416.967(a) except for lifting or carrying more than 10 pounds occasionally and less weight frequently; standing or walking more than 2 hours in an 8-hour workday; sitting more than 6 hours in an 8-hour workday; stooping, kneeling, crouching, or crawling more than occasionally; and performing more than simple, routine, repetitive work. (Tr. 17). The ALJ found that Sessums had no past relevant work. (Tr. 19). The ALJ determined that, based on Sessums' RFC, jobs exist in significant numbers in the national economy that he could perform. (Tr. 20). Consequently, the ALJ found that Sessums was not disabled since May 24, 2012, the date the application was filed. (Tr. 20).

## III. Administrative Record

The following is a summary of relevant evidence before the ALJ.

### A. Hearing Testimony

Sessums testified on May 1, 2014, as follows:

Sessums was 41 years old. (Tr. 33). He lives in Hornersville, Missouri. (Tr. 33). He finished ninth grade but never got a GED. (Tr. 33). He attended resource classes in seventh and eighth grades. (Tr. 33). He can read and write but he forgets most of what he reads. (Tr. 34). He had 2 back surgeries. (Tr. 34). On September 5, 2012, he had a fusion. Later, he had a screw removed and replaced from L5. (Tr. 34). He still has lower back pain and pain that runs from his back to both legs. (Tr. 34). He can stand or walk for a half an hour before he has to sit down. (Tr. 35). He has pain while sitting. (Tr. 35). He has to stand up or lie down after sitting for 15-20 minutes. (Tr. 35). He has pain while moving from side-to-side because it twists his back. (Tr. 35-36). In January 22, 2013, after his last surgery, the nurse told him to stay with his current restrictions. (Tr. 36). He wasn't supposed to lift anything 5-10 pounds; no bending, stooping, climbing. (Tr. 36). He was taking Percocet then. (Tr. 36). He currently takes some muscle relaxers, pain medications, and Xanax. (Tr. 37). The medication "throws [him] off balance" and makes him drowsy. (Tr. 37).

On a typical day, Sessums has to lie down and rest or prop his feet up and rest. (Tr. 37). He constantly has to move to relieve pressure on his back. (Tr. 38).

He takes Xanax for an anxiety disorder. (Tr. 38).

Sessums can make small meals and can clean for 15-20 minutes at a time. (Tr. 38). He does not have a driver's license. (Tr. 39).

Sessums would not be able to perform a sedentary job because he would not be able to perform the twisting. (Tr. 39).

Sessums has problems with pain radiating down his legs. (Tr. 39). He is constantly in pain. (Tr. 40).

He cannot afford physical therapy. He would go to physical therapy and go through pain management if he had medical benefits. (Tr. 40). The neurosurgeon told Sessums that pain management is the only thing that would help his condition. (Tr. 40).

Sessums went to the Advanced Pain Center in Kennett before and after his surgery. (Tr. 41).

Sessums' primary care doctor prescribed the Xanax and the pain medications. (Tr. 41). His primary care physician did not indicate that Sessums should see a mental health professional. (Tr. 42). Sessums no longer takes Percocet. He takes Tramadol, Xanax, a muscle relaxer, and blood pressure medicine.

Sessums' longest employment was in 1998 at Emerson Electric in Kennett, Missouri as a machine operator. (Tr. 43-44). He carried lightweight items and stood the whole time. In 2006, Sessums performed temporary work for a gun cleaning service. (Tr. 44). He previously worked at a saw mill in Campbell, Missouri on and off from 2004-2005. (Tr. 45).

Vocational expert Susan Shay testified as follows:

The first hypothetical person would be the same age as Sessums, who was limited to light work activity; only occasionally stoop, kneel, crouch or crawl; and limited to simple, routine, repetitive tasks. (Tr. 46). Such an individual could perform Sessums' past work as a light machine operator. (Tr. 45-46). This person also could perform work as a light housekeeper, light laundry worker, and light machine tending worker. (Tr. 46-47).

The second hypothetical person is the same age, education and work experience. (Tr. 47). This second person is limited to sedentary work; limited to simple, routine, repetitive tasks; can occasionally stoop, kneel, crouch or crawl. This person could not perform Sessums' past

work, but he could work as a sedentary table worker, sedentary final assembly worker, and sedentary machine feeder. (Tr. 47-48).

The third hypothetical person had the same limitations as the person in hypothetical number two, but also required up to three extra, unscheduled breaks, during an eight-hour day to lay down for up to 30 minutes. (Tr. 48). No jobs would be available for this person. (Tr. 48).

If hypothetical persons numbers one and two could only occasionally reach with either arm then they would not be able to perform the jobs mentioned. If hypothetical persons numbers one and two would miss two days of work per month on a consistent basis, then they could not perform any of the jobs mentioned. (Tr. 48). If hypothetical persons numbers one and two were off-task 15 percent of the day due to the side effects of mediation and pain, then they would not be able to perform any of the jobs identified. (Tr. 49).

**B.     Medical Evaluations**

Sessums' relevant medical evaluations are summarized as follows:

On October 20, 2011, Sessums was seen by Su Min Ko, M.D., at Advanced Pain Management (APM) for evaluation and management of low back pain. (Tr. 290-95). Sessums reported pain as moderate-to-severe for the last 5 years. (Tr. 290). Sessums reported smoking a pack of cigarettes per day. An MRI was ordered and an epidural injection, and Sessums was to follow up in 14 days.

On November 2, 2011, Sessums returned to see Dr. Ko. (Tr. 286-90). Sessums stated the pain was aggravated with any physical activity and relieved by rest and medication. The pain was mild to moderate, but sometimes severe. Sessums reported that the pain medication was helping and improving daily functioning and sleep, and his pain was tolerable. Dr. Ko added Tramadol for pain to Sessums' medications.

5

On December 2, 2011, Sessums was seen by Dr. Ko for a medication follow-up. (Tr. 282-86). Sessums reported that the hydrocodone was effective and that he was somewhat improved. (Tr. 282).

On January 26, 2012, Sessums was seen by Dr. Ko complaining of lower back pain to left hip. (Tr. 273-77). He again reported that the hydrocodone was effective in treating the pain. Dr. Ko added gabapentin for pain. (Tr. 276).

On February 22, 2012, Sessums saw Dr. Ko. (Tr. 270-73). Sessums reported that the medications are helping and managing the pain. Sessums reported the medications are improving his daily functioning, activities and sleep. (Tr. 271).

On March 21, 2012, Sessums was seen by Dr. Ko. (Tr. 266-70). Sessums complained of lower back pain and said that his symptoms were somewhat improved with medication. Dr. Ko prescribed methocarbamol. (Tr. 269).

On April 19, 2012, Sessums was seen by Dr. Ko for a medication follow-up. (Tr. 263-66). Sessums reported that the medications were helping and managing the pain, and the medications were improving daily functioning, activities and sleep. (Tr. 263).

On May 9, 2012, Sessums was seen by Dr. Ko with complaints of lower back pain. (Tr. 259-62). Sessums again states that his pain has been improved with medication.

On June 5, 2012, Sessums was seen by Dr. Roger Cagle with complaints of pain from a bulging disc and anxiety. (Tr. 299-301). Sessums was diagnosed with lumbago, displacement of lumbar intervertebral disc without myelopathy, sciatica and anxiety. (Tr. 300).

On June 12, 2012, Sessums underwent an MRI of his lumbar spine. (Tr. 307-08). L5-S1 had a left posterolateral disc herniation; there was a compression of the left S1 nerve root least to moderate degree with displacement of the nerve root. (Tr. 307).

6

On July 5, 2012, Sessums went to see Dr. Cagle with complaints of back pain, anxiety and that his medication was not working. (Tr. 369-70). Sessums continued his medication.

On August 3, 2012, Sessums saw Dr. Cagle for refills on medications for his back pain and anxiety. (Tr. 371-72). Dr. Cagle discussed an anonymous call he had received regarding Sessums' abuse of medications and Sessums' failure to respond for a pill count. Dr. Cagle would not give Sessums any more controlled medications. Sessums indicated that he was scheduled for back surgery.

On July 6, 2012, Sessums saw Dr. Ricardo Cortez, who diagnosed Sessums with L5-S1 disc herniation. (Tr. 376). Dr. Cortez prescribed physical therapy. Sessums said he could not afford physical therapy so Dr. Cortez gave him some exercises.

On or around August 6, 2012, Sheri L. Simon, Ph.D. conducted a consultative examination of Sessums. (Tr. 59-66). Dr. Simon found that Sessums had an anxiety disorder that resulted in moderate difficulty in social functioning, and maintaining concentration, persistence, or pace.

On August 14, 2012, Dr. Cortez talked to Sessums on the telephone about a possible posterior lumbar fusion at L5-S1. (Tr. 377).

On September 4, 2012, Sessums had a CT of his lumbar spine. (Tr. 495-96). The CT showed at L5-S1 at a broad-based diffuse disc bulge slightly more focal in the left paracentral and foraminal location. Posterior osteophyte was also present. There was moderate to severe left neural foraminal and moderate right neural foraminal narrowing. Finally, there was mild to moderate central canal narrowing also present.

On September 5, 2012, Dr. Cortez performed a posterior arthrodesis (surgical fusion) at L5-S1 on Sessums at St. Bernard's Medical Center. (Tr. 312-17).

On September 20, 2012, Dr. Cortez's examination of Sessums showed that he was well-healed. Dr. Cortez noted that full healing takes up to a year.

On October 23, 2012, Dr. Cortez's examination showed that Sessums' incision was well-healed. (Tr. 375). Sessums complained of muscle spasms and low back pain. Dr. Cortez recommended physical therapy and provided Sessums with back exercises.

In October 2012, Dr. Johnathan Norcross reviewed the medical records and opined that Sessums could occasionally carry 20 pounds, frequently carry 10 pounds, stand or sit for 6 hours in an 8 hour workday, occasionally climb ramps/stairs, occasionally climb ladders/ropes/scaffolds, occasionally balance, occasionally stoop, kneel, crouch and crawl. Dr. Norcross recommended that Sessums be limited to light work. (Tr. 61-67).

Sessums was treated at Hollis Clinic on November 1 and 30, 2012. He was diagnosed with lumbar pain post-surgery, hypertension, and anxiety. (Tr. 421-22).

On December 4, 2012, Sessums was seen by Dr. Cortez for a follow-up after surgery. (Tr. 399). He continued to complain of pain in his right hip that radiates down. (Tr. 399). Dr. Cortez's examination showed the Sessums was well-healed. Dr. Cortez ordered a CT to evaluate the screw placement and the status of his fusion. (Tr. 399).

On December 6, 2012, Dr. Cortez reviewed the CT scan, which showed a medially placed L5 screw. Dr. Cortez recommended surgery on January 7, 2012 to correct this. (Tr. 393).

On December 21, 2012, Dr. Cortez filled out a disability certificate that indicated Sessums had been disabled from July 6, 2012 until December 21, 2012, and that Sessums would continue to be disabled for another four (4) months. (Tr. 394).

On January 7, 2013, Dr. Cortez performed surgery on Sessums to revise the medically placed screw. (Tr. 402-09).

On January 16, 2013, Dan Donahue, Ph.D. reviewed the updated medical records to perform a mental residual functional capacity assessment. (Tr. 82-84). Dr. Donahue affirmed Dr. Simon's opinions regarding Sessums' mental limitations.

On January 22, 2013, Sessums was seen by Crystal Watson, PA-C for a two-week follow-up appointment. (Tr. 427). Sessums' symptoms of pain running down his right lower extremity were mostly resolved. He continued to complain of pain in the right paraspinal muscles and occasional radiation into the right groin. He was given a prescription for Percocet.

On January 30, 2013, Bill Payne, M.D. reviewed the updated medical records to perform a physical residual functional capacity assessment. (Tr. 80-82). Dr. Payne affirmed Dr. Norcross' opinion that Sessums could perform light work.

On April 4, 2013, Sessums was seen by Dr. Tim Maryanov and Crystal Watson for a three month follow-up appointment. (Tr. 429). Sessums complained of pain in his back with occasional radiation into the lower extremities. The x-ray showed stable hardware placement and he was referred for pain management. Dr. Maryanov refused to fill out Sessums' disability paperwork.

On April 20, 2013, Sessums was seen by Dr. Nicholas Tannous at Advanced Pain Management. (Tr. 470-72). Sessums reported his pain as a 10 on a scale of 10. Sessums had pain associated with flexion. Dr. Tannous prescribed Tizanidine, Gabapentin, and Hydrocodone-Acetaminophen. Sessums returned to the pain clinic on May 8, June 7, July 8, and August 1, 2013. (Tr. 459-69). Sessums indicated that the medications were improving daily functioning. (Tr. 463, 469). Sessums was continued on the same pain management regimen.

On September 10, 2013, Sessums was seen by Dr. Abdullah Arshad at the Pemiscot Primary Care Center with complaints of lower back pain. (Tr. 449). Sessums stated that he

could not be seen at Kennett pain clinic any longer because he was self-pay. Dr. Arshad reported that Sessums could not carry out any gainful employment due to his severe physical impairment.

On March 27, 2014, Sessums was seen by Dr. Arshad for a follow up appointment. (Tr. 475). Sessums was diagnosed with back pain, muscle spasms, anxiety disorder, and hypertension. Dr. Ashad refilled Sessums' prescriptions.

In a letter dated April 24, 2014, Dr. Ashad stated that Sessums had two failed back surgeries and is unable to do physical gainful employment. (Tr. 453).

On June 10, 2014, Sessums was seen by Dr. Barry Burchett of Tri-State Occupational Medicine for an internal medicine examination. (Tr. 481-92). Dr. Burchett filled out a Medical Source Statement of Ability to Do Work-Related Activities (Physical). Sessums reported bilateral low back pain that was exacerbated by bending, twisting, or sitting more than 20 minutes at a time. Dr. Burchett opined that Sessums could frequently lift up to 10 pounds; occasionally carry up to 10 pounds; could sit for 30 minutes without interruption; could sit, stand, and walk for 4 hours in a normal workday; could occasionally reach; never push/pull; could occasionally operate foot controls; could occasionally balance; never climb, stoop, kneel crouch, or craw; and could occasionally operate a motor vehicle.

IV. **Legal Standard**

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits.

20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities ... ." *Id.* "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[2] 20 C.F.R. §§ 416.920(e), 404.1520(e). At this step, the burden rests with the claimant to establish his RFC. *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008); *see also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f). If it is found that the claimant can still perform past

---

[2] "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

11

relevant work, the claimant will not be found to be disabled. *Id.*; 20 C.F.R. § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, the analysis proceeds to Step 5.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. § 416.920(a)(4)(v). If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled. *Id.*; *see also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id.*; *see also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial

evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)). Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

## V.     Discussion

Sessums claims that the ALJ's decision is not supported by substantial evidence. Sessums argues that the ALJ's finding that Sessums is limited to simple, unskilled sedentary work with only occasional stooping, kneeling, crouching, and crawling conflicts with the opinions of Sessums' treating and examining doctors. (ECF No. 10 at 13). Sessums argues that examining physician Dr. Burchett's opinion that Sessums is limited to sitting only four hours in an eight-hour workday for only 30 minutes at a time conflicts with the ALJ's finding that Sessums can perform sedentary work. Sedentary work requires the ability to remain in a seated position for approximately six hours of an eight-hour workday with normal break. (ECF No. 10 at 12). Dr. Burchett also opined that Sessums could only occasionally reach overhead, but the ALJ included no limitations on overhead reaching in his RFC. (ECF No. 10 at 13). Sessums further argues that the ALJ omitted Dr. Burchett's findings that Sessums can never push/pull, only occasionally operate foot controls, only occasionally balance, and never climb, stoop, kneel, crouch, or crawl. (ECF No. 10 at 13-14). Sessums acknowledges that the ALJ gave Dr.

Burchett's opinion less weight on the ground that it was based on Sessums' subjective complaints. (ECF No. 10 at 14 (citing Tr. 19)). Sessums, however, notes that Dr. Burchett indicated that the restrictions were based on Sessums' history as well as his decreased ability to squat and decreased lumber flexion. (ECF No. 10 at 14). Sessums asserts that the ALJ improperly failed to provide Dr. Burchett with only a single medical report and none of the MRI or CT scans. (ECF No. 10 at 14-15). Sessums argues that the ALJ erroneously gave controlling weight to the opinions of state agency doctors who only performed a record review, instead of to the opinions of Dr. Burchett and Dr. Arshad, who examined or treated Sessums. Sessums notes that the state agency doctors only reviewed the medical records until January 2013, which did not include Sessums' second surgery. Finally, Sessums argues that the ALJ erred by not including Sessums' limitations in concentration, persistence and pace in the hypothetical for the vocational expert. (ECF No. 10 at 15-16).

The Court holds that the ALJ properly considered all of the evidence in the record as a whole when he determined Sessums' RFC. The ALJ articulated appropriate bases for the weight given the evidence in the record and found that Plaintiff retained the RFC to perform a range of simple, sedentary work. (Tr. 17). Contrary to Sessums' claims, the ALJ accounted for Sessums' mental limitations in the RFC. The ALJ found that Sessums' severe impairments included anxiety and he suffered from "moderate" limitations in maintaining concentration, persistence, or pace. Based upon these impairments, the ALJ properly found that Sessums was limited to simple, repetitive, routine work. (Tr. 17); *see Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) ("the ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures Howard's deficiencies in concentration, persistence or pace"); *Brachtel v. Apfel,* 132 F.3d 417, 421 (8th Cir.1997) (holding that hypothetical including the

"ability to do only simple routine repetitive work, which does not require close attention to detail" sufficiently describes deficiencies of concentration, persistence or pace). The ALJ properly considered Sessums' mental impairment and incorporated the credible limitations into his RFC findings. (Tr. 16-18).

Likewise, the Court holds that the ALJ properly considered the record as a whole, including Sessums' subjective complaints. To analyze a claimant's subjective complaints of pain, the ALJ examines: (i) the claimant's daily activities; (ii) The location, duration, frequency, and intensity of the claimant's pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the claimant's pain or other symptoms; (v) Treatment, other than medication, the claimant receives or has received for relief of the claimant's pain or other symptoms; (vi) Any measures the claimant uses or has used to relieve the claimant's pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §416.929. In evaluating Sessums' RFC, the ALJ properly evaluated Sessums' limited, conservative and sporadic treatment. (Tr. 14-15). The Court holds that the ALJ properly considered Sessums' failure to seek consistent medical care, which seriously undermined his claims of chronic and extreme pain. *See Edwards v. Barnhart*, 314 F.3d 964, 967–68 (8th Cir. 2003) ("It was within the province of the ALJ to discount Edwards's claims of disabling pain in view of her failure to seek ameliorative treatment."). Instead of disabling hip and back pain, the records show that Sessums' pain was controlled with medication. (Tr. 15, 18, 188, 262-63, 266, 270-71, 274, 277-78, 281-82, 285-86, 290, 342, 461, 463, 469). Sessums testified as to the side effects at the hearing, but he denied

any side effects to his medical providers. (Tr. 18, 37, 263, 271, 281, 286, 290, 459, 463-64, 466, 469). Sessums' condition improved following his back surgeries in September 2012 and January 2013, and he was discharged from treatment. (Tr. 328, 427, 429, 434). Sessums refused injections for his neck pain. (Tr. 286, 299, 324). He sought no treatment from a mental health specialist. (Tr. 18).

Likewise, the ALJ found that Sessums' allegations of disabling impairments were not supported by the objective evidence. Sessums alleged disability based upon hip and back pain. However, the physical examinations revealed normal gait, full range of motion, full strength, and no sensory deficits. (Tr. 288, 293-95, 299-300, 325, 336, 342, 345, 348, 369-72, 399, 405, 427, 429, 449, 451, 460-61, 465-66, 475, 482-86). Following his back surgery, Sessums' x-rays showed normal and stable alignment. (Tr. 330, 400, 429). He appeared alert, oriented, and cooperative with a normal thought process, good judgment, and intact memory. (Tr. 261, 268-69, 275, 76, 280, 284, 288, 293, 299, 325, 345, 369, 371, 405, 449, 460-61, 466, 471, 482); *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010) ("Despite her claimed inability to work, multiple examinations demonstrated no abnormalities, and she repeatedly appeared alert and oriented with normal speech and thought processes."). Thus, the medical records did not support Sessums' alleged limitations.

The ALJ properly weighed Sessums' poor work history. (Tr. 18). *See Buckner v. Astrue*, 646 F.3d 549, 556-58 (8th Cir. 2011) (Buckner's sporadic work history prior to his alleged disability date indicated that he was not strongly motivated to engage in productive activity, which weighed against his credibility).

Finally, the Court holds that that the ALJ properly evaluated the medical opinions. (Tr. 15, 19). In regards to Sessums' mental health, the ALJ reviewed the state agency medical

consultants' opinions. (Tr. 19, 59-60, 63-65, 77-79, 82-84). He gave great weight to the opinions of Dr. Simoon and Dr. Donahue and incorporated those opinions into his RFC finding. There was no opinion that Sessums was precluded from performing simple, routine, repetitive work based upon his mental impairments. The Court holds that the ALJ's opinion regarding Sessums' mental RFC is supported by substantial evidence.

With regards to Sessums' physical limitations, the ALJ properly evaluated the medical opinions and found that the state agency medical consultants' opinions were entitled to great weight, but Dr. Burchett's opinion was entitled to little weight. (Tr. 15, 19). After his second surgery, Dr. Maryanov noted that most of Sessums' symptoms seemed to have been resolved. In April 2013, Dr. Maryanov refused to complete a form supporting Sessums' disability application and he was referred to pain management. The ALJ considered this medical information, along with the remainder of the record, to determined Sessums' RFC.

Further, contrary to Sessums' argument, the ALJ properly weighed Dr. Burchett's opinion, affording it little weight. (Tr. 15, 19). During Sessums' examination with Dr. Burchett, Sessums exhibited full strength, intact sensation, normal gait, and subjectively limited lumbar range of motion. (Tr. 483-86). As previously discussed, Dr. Burchett limited Sessums to lifting only 10 pounds and sitting/standing/walking for only 4 hours in an 8 hour workday. The ALJ noted that Dr. Burchett's opinion was based on Sessums' history and subjective complaints, rather than on independent medical findings. (Tr. 19); *see McCoy v. Astrue*, 648 F.3d 605, 617 (8th Cir. 2011) ("Finally, the ALJ noted that Dr. Puente's evaluation appeared to be based, at least in part, on McCoy's self-reported symptoms and, thus, insofar as those reported symptoms were found to be less than credible, Dr. Puente's report was rendered less credible."). Dr. Burchett's opinions also were inconsistent with the medical records. For example, Sessums

exhibited difficulty squatting during Dr. Burchett's examination, but other medical records showed no such difficulty. (Tr. 300, 369, 372, 484, 490). In contrast, the ALJ accepted Dr. Burchett's lifting restriction because it was consistent with the lifting restrictions placed on Sessums by his treating sources. (Tr. 17, 343, 427, 487). Thus, the ALJ properly evaluated Dr. Burchett's opinion and found it entitled to little weight.

Sessums also claimed that Dr. Ashad's statement that Sessums could not perform "gainful employment" supports Dr. Burchett's opinion. (ECF No. 10 at 15 (citing Tr. 453)). This assessment, however, is limited to the Commissioner and is entitled to no deference. 20 C.F.R. §416.927(d); *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) (citing *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination."). Dr. Arshad identified no functional limitations and the ALJ properly found this opinion entitled to no weight.

In sum, the ALJ properly considered the opinions of the state agency medical consultants. Dr. Norcross reviewed the medical records and opined that Sessums could perform light work with occasional postural activities. Dr. Payne later reviewed the updated the medical records and agreed with Dr. Norcross. The ALJ found that these opinions were consistent with the record and properly afforded them great weight. The ALJ gave these opinions great weight and further restricted Sessums to sedentary work consistent with the temporary restrictions (such as lifting) provided by his treating sources. The Court finds that these restrictions are supported by substantial evidence.

The Court holds that the ALJ properly included all supported limitations in Sessums' RFC and the vocational expert testified that such an individual could perform work existing in

significant numbers in the national economy. As such, the ALJ properly concluded that Sessums was capable of other work and, thus, not disabled.

**VI.     Conclusion**

Based on the foregoing, the Court finds that the ALJ's decision was based on substantial evidence in the record as a whole and should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that this action is **AFFIRMED**. A separate Judgment will accompany this Order.

Dated this 16th day of February, 2017.

_____
RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE